## THE RIVERSDALE.

## THE ALLEN GREEN.

### NICKERSON v. THE RIVERSDALE.

### LAING v. THE ALLEN GREEN.

(District Court, S. D. New York. November 23, 1892.)

COLLISION—BROKEN RUDDER CHAIN—DEFECTIVE EQUIPMENT—LOOKOUT.
A steamer meeting a sailing vessel, put her wheel over to avoid her, when her rudder chain, being defective, broke. No explanation of her insufficient equipment was offered. She thereafter backed and blew alarm whistles, but the sailing vessel, by reason of having no lookout, did not appreciate the steamer's disabled condition in time to avoid her, as she might have done. For the resulting collision, *held*, that both vessels were in fault.

In Admiralty. Libel by A. L. Nickerson against the steamer Riversdale, to recover damages for a collision with the schooner Allen Green, and cross libel by Arthur Laing against the schooner. Decree for divided damages.

Owen, Gray & Sturges, for the Riversdale.
Robinson, Biddle & Ward, for the Allen Green.

BROWN, District Judge. At about half past 2 o'clock in the afternoon of May 24, 1892, as the steamer the Riversdale was steaming slowly up the upper bay a short distance below Bedloe's island, the starboard bow, about 20 feet aft of the stem, came in collision with the bowsprit of the schooner Allen Green, which was going down, and both received some damage, for which the above libel and cross libel were filed. The wind was about southwest—a fresh breeze, with occasional lulls. The schooner, when nearly ahead of the

steamer, was observed to be heading somewhat towards Bay Ridge, as if intending to haul over to the east side of the channel way. The pilot of the steamer thereupon gave the order to starboard; but in the attempt to execute that order the rudder chain broke, and the steamer consequently lost the use of her helm. Thereupon she shortly after stopped her engines, and reversed; and many witnesses in her behalf contend that she was actually going astern through the water at the time of the collision. The tug on her starboard side, fastened only by her bowline, had her stern swung out by the reversal of the steamer. This fact would seem to confirm the witnesses of the steamer that she was actually going astern before collision. She was previously proceeding under a slow bell, and the testimony indicates that there was ample time for her to have acquired sternway. Her witnesses contend that collision was brought about by the luffing of the schooner to the westward, and because the schooner paid no attention to the repeated sounding of danger signals, both from the Riversdale, and her tug, from the time that the rudder chain broke.

I think this collision arose from the fault of both vessels. The primary cause was the breaking of the rudder chain. A link of the broken chain was produced in court, and showed that it had lost one third of its area through long wear. The iron was of medium quality. At the time when it broke, there could not have been any unusual strain upon it. There being no other explanation, I must hold the vessel responsible, as for insufficient appliances and equipment, and neglect to keep her in a proper state of efficiency and repair. See The Exe, 52 Fed. Rep. 155. I can hardly treat as an additional fault the fact that the steamer did not reverse instantly, but only after the lapse of one or two minutes, that being from five to ten minutes before collision. She repeatedly sounded danger signals; and this, together with her evident reversal, ought, I think, to have been reasonably understood by the schooner, as an indication of disability, or of something unusual,—enough to put the schooner on her guard, and to keep out of the way.

The evidence shows that no lookout was maintained on the schooner. She had been just before dropped by a tug, and after the hawser was hauled in, her foretopsail was ordered set. The master was at the wheel, and the mate was seeing to the execution of this order. But the men refused to obey, and went aft to confer with the captain; and in the mean time no one was on the lookout. The captain heard only one danger signal, and that shortly before collision, which shows that the various previous signals were not noticed. The mate, who was claimed to have been acting as lookout, was not only performing other duties, but himself states that, after noticing the steamer while they were hauling in the hawser, he did not observe her until the "next occasion," when "the captain called out to him to know what the steamer was blowing for,—blowing her whistles," which, as just observed, is shown to have been only very shortly before collision.

The schooner claimed that the tide was slack low water, and that there was almost no wind, so that the schooner had no headway of her own. I am not persuaded of the correctness of either of these points. The other witnesses say that the tide was ebb, meaning that

the current was ebb. According to the almanac it was high water that day at about 7 P. M. The ebb current there continues to run down until within about three hours of high water at Governor's island, (The Ludvig Holberg, 36 Fed. Rep. 917, note, div. 3;) on this occasion, therefore, until about 4 o'clock—an hour and a half after the collision. The wind, moreover, is shown to have been fresh, viz.: from 12 to 14 knots; and though there were some lulls, these did not go below 7 knots; so that if a proper lookout had been kept, there was abundant opportunity for the steamer's disability to have been recognized, and ample wind and space for the schooner to have kept out of her way.

Decrees may be entered accordingly on each libel for one half the damages, and costs.