## THE ALLEN GREEN.

### LAING v. THE ALLEN GREEN.

(Circuit Court of Appeals, Second Circuit. February 27, 1894.)

#### No. 60.

COLLISION—STEAMER AND SAIL—BROKEN RUDDER CHAIN—LOOKOUT.

A steamer meeting a schooner put her wheel over to avoid her, when the rudder chain broke. It appeared that the broken link was reduced one-third by wear, and the chain was open to inspection. The steamer immediately sounded danger signals; but these, owing to the absence of a lookout on the schooner, and a discussion going on between the master and crew, were not noticed by her in time to avoid collision, although there was ample time to do so. *Held*, that both vessels were in fault. 53 Fed. 286, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

These were cross libels filed by Arthur Laing and Arthur L. Nickerson, respectively, to recover damages for a collision between the steamer Riversdale and the schooner Allen Green. There was a decree below for divided damages (53 Fed. 286), and both parties appeal.

Edward L. Owen, for appellant.
Henry G. Ward, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. On the afternoon of May 24, 1892, the steamship Riversdale, the property of libelant, was in collision with the schooner Allen Green a short distance below Liberty or Bedloe's Island, in the Bay of New York. For the damages resulting to the steamship, the district judge held both vessels in fault. 53 Fed. 286. The steamer sighted the schooner nearly ahead in ample time to avoid her, and the pilot gave the order to starboard. In the attempt to comply therewith, the rudder chain broke, and the steamer consequently lost the use of her helm. There is the usual conflict of testimony as to the velocity of the wind, and the navigation of the vessels. The evidence, however, abundantly sustains the conclusions of the district judge that shortly after the breaking of the rudder chain, and several minutes before collision, the steamer, which was proceeding under a slow bell, stopped and reversed, and had actually acquired sternway before the collision. She also repeatedly sounded danger signals to indicate that she was under

some disability, which would require other vessels approaching her to be upon their guard, and, if necessary, exert themselves to avoid collision.

The schooner had been towing on a hawser down the Sound, East river, and into New York bay. Just before the steamer's catastrophe, the towing hawser had been cast off; and thereupon the entire crew, who were afraid to continue the voyage, as the schooner was in a leaky condition, came aft to the captain, and entered into a discussion with him, asking to be paid off and discharged. No one was left on lookout, and, though the captain remained at the wheel, his attention was so engrossed by the discussion with his crew that neither by himself, nor by any one on board, were the movements of the steamer observed, nor her danger signals noticed, until just on the edge of the collision. The proximity of the steamer was in fact called to the attention of those on the schooner by the captain of the schooner's tug. There is nothing in the additional proofs taken in this court which will warrant a reversal of the decision of the district judge that, "if a proper lookout had been kept, there was abundant opportunity for the steamer's disability to have been recognized, and ample wind and space for the schooner to have kept out of the way."

Undoubtedly the breaking of the rudder chain was the primary cause of the collision; and the steamer was held in fault on the ground that she was responsible for "insufficient appliances and equipment, and neglect to keep her in a proper state of efficiency and repair." The further proofs taken in this court support this conclusion. The link which parted had been reduced, by attrition, one-third in cross section, at the point of fracture. There is no indication of any latent defect or flaw in the iron, which the expert testified was of medium quality, and broke altogether through the reduction of its area by wear and tear. The steamship, it is true, was just coming into port after a voyage from China, using the same chain; but, as the expert testifies, it had probably "been wearing pretty rapidly the latter part of its days." And though it may have been in good enough condition, when it left China, to bring the steamer over, it certainly was not in good enough condition, when it passed Sandy Hook, to bring her up the Bay of New York. It is a reasonable assumption that the chain was made of links of the original size, because, in the experienced judgment of those who made them, links of substantially that size were needed to meet the strains to which they would be exposed in such service. The chain was uncovered, and open to inspection. It was examined and oiled each day by the carpenter, who could easily detect so great a reduction in the size of this link. The ship is therefore chargeable with a knowledge of such reduction; and for a failure to replace the weakened link by a shackle (as was done after it broke), thus restoring the chain substantially to its original efficiency, the steamer must be held responsible.

Decree of district court affirmed, with interest, but without costs.